## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

G. LEE TRUSSELL,
BRUNO E. CARRARA
and JERRY D. GEIST,

      Plaintiffs,

v.                                                    Civil Action, File **No.  02-1337-RLP/LFG**

ENERGY & TECHNOLOGY
COMPANY, LTD.,
a Bermuda corporation, and
E-TECH NORTH AMERICA, LTD.,
a Delaware corporation,

      Defendants.

## PLAINTIFFS' REQUESTED FINDINGS OF FACT
## AND REQUESTED CONCLUSIONS OF LAW

      Come now the Plaintiffs, by their counsel, and submit herewith their Requested Findings of Fact and Requested Conclusions of Law in advance of the trial of this matter.

### Requested Findings of Fact

      1.      In early 2000, Turkish citizen Nuri Colagoklu approached Jerry Geist, a New Mexico energy executive and consultant, to enlist his expertise and support in developing certain energy related projects, including assistance in developing a LNG (liquified natural gas) terminal being built in Turkey by EGE GAZ, a Colakoglu controlled company.  [Anticipated testimony of Plaintiff Geist; Pl. Exhibits 2, 3, 4 and 5 (materials from January 28, 2000 meeting); **Stipulated Factual Contentions**, Section IV.(A) of proposed Pretrial Order (hereafter, "Facts", No. 4.].

      2.      The LNG terminal was the first (and only) privately owned LNG terminal in Turkey. [Geist testimony; Hoey deposition, p. 86, lines 7-11].

3.     Energy & Technology Company (hereafter, "ETC") (a Bermuda company) and E-Tech North America, Ltd. (hereafter, "E-Tech") (a Delaware company which was wholly owned by ETC) were formed as entities in support of developing the projects. [Facts No. 1, 2, 5; preliminary memoranda, Plaintiffs' Exhibits 5, 13; ETC Articles of Incorporation / Bye-Laws, Exhibit 19; Johnston memo, Exhibit 8;  E-Tech Articles of Incorporation, Exhibit 28; E-Tech Structure Evaluation, Exhibit 26;  Geist testimony; Trussell testimony].

4.     The ETC bylaws provide its employees with a right to indemnification for costs and legal expenses and bar certain claims brought by the company against its employees and officers.  [Facts No. 21-23;  ETC Bye-Laws, Exhibit 19].

5.     Both companies were closely held by, and subject to the actual control of,  the Colakoglu interests, for which Nuri Colakoglu acted and spoke. [Fact No. 3; ETC Minutes, Exhibits 14 and 18;  Geist testimony; Johnston testimony.]

6.     As intended by Colakoglu, the plaintiffs were hired as officers of ETC, *i.e.*, senior vice-presidents.    [Preliminary memoranda, Exhibits 5, 8, 13; Budgets, Exhibits 6, 15; Agreements, Exhibits 21, 22, 23;  Geist testimony; Trussell testimony; Carrara testimony; Johnston testimony.]

7.     The salaries and expenses (including leases of business offices) and other financial aspects related to the plaintiffs' employment by ETC and E-Tech were discussed and appropriately approved.  [Preliminary memoranda, Exhibits 5 and 8; Minutes of ETC meeting, Exhibit 18; Budgets, Exhibits 6, 15; office location, Exhibit 17; Geist fax, Exhibit 13;  Geist testimony; Johnston testimony.]

8.     The leases were made and used for appropriate purposes and did not constitute

-2-

undisclosed self dealing between the corporate parties and any or all of the plaintiffs. [Preliminary memoranda, Exhibits 5, 8 and 13; Lease of Albuquerque property, Exhibit 30; Lease of Monaco property and Lease communications, Exhibits 11 and 12; budgets, Exhibits 6, 15;  Geist testimony; Johnston testimony.]

9.   Geist, who was a minority shareholder, also was elected as one of two directors.  Geist's director position was the only one with any authority--the other director being a "strawman" for Colakoglu.  [Minutes of ETC meetings, Exhibits 14 and 18; Bye-Laws, Exhibit 19; Geist testimony; Johnston testimony.]

10.   Consistent with the preliminary and continuing arrangements approved by the shareholders--including the Colakoglus--the plaintiffs executed employment commitment agreements which were subsequently extended or modified.  [Minutes of ETC meetings, Exhibits 14, 18, 36-39, 71;   Employment Agreements of Geist, Trussell and Carrara, Exhibits 21, 22, 23; Employment Extension Agreements of Geist, Trussell and Carrara, Exhibits 81, 82 and 83; Preliminary outline/budget, Exhibits 5, 6 and 8; Budget, Exhibits 6 and 15; Geist testimony.]

11.   Colakoglu arranged for Kingsland Development, another Colakoglu controlled company, to agree to fund ETC with $10,000,000 under a consulting agreement over a two-year period.  [Fact No. 6; Kingsland contracts, Exhibit 20 (w/Johnston fax); Geist testimony; Johnston testimony; Trussell testimony.]

12.   The details of managing the company were subject to Nuri Colakoglu's directions. [Preliminary memoranda, Exhibits 5 and 8; faxes to Colakoglu, Exhibits 24, 31, 45, 46, 47, 48, 49, 58, 61, 68, 69, 70, 72, 74, 75, 76; Geist testimony; Johnston testimony; Trussell testimony; Carrara testimony.]

13.     Up until mid-June 2002, Colakoglu and Geist managed ETC's affairs until Nuri Colakoglu directed Geist to convene a shareholders meeting for the purpose of electing new and additional directors. [Hoey fax to Geist, Exhibit 85; Colakoglu letter, Exhibit 86; Geist testimony.]

14.     Up until that time, the companies had been run extremely informally, consistent with Nuri Colakoglu's instructions. [Geist testimony; Johnston testimony; Trussell testimony; Carrara testimony.]

15.     Every decision committing money or corporate resources, received the express or implied approval of Nuri Colakoglu.  [Budgets, Exhibits 6 and 15; Geist faxes, Exhibits 31 and 33; Johnston notes, Exhibit 71; Geist testimony; Johnston testimony; Trussell testimony; Carrara testimony.]

16.     During their tenure as officers and employees, the plaintiffs engaged in or made no unauthorized or  undisclosed transactions.  [Geist testimony; Trussell testimony; Carrara testimony.]

17.     The plaintiffs provided appropriate accountings to Nuri Colakoglu. [Accountings, Exhibits 184-196, 202;  Geist testimony; Trussell testimony; Carrara testimony.]

18.     Nuri Colakoglu, for the company/ies, was informed of and agreed to a course of action to acquire the rights in a Turkish oilfield (the Selmo field).   [Geist faxes, Exhibits 31, 33 and 34; Geist testimony; Trussell testimony.]

19.     Nuri Colakoglu directed the plaintiffs to use Colakoglu's bank (TEB) to finance the acquisition of the oilfield rights.  [Minutes, Exhibit 27; Geist testimony; Trussell testimony; Carrara testimony; Johnston testimony.]

-4-

20.     Colakoglu's company, Kingsland, provided guaranties for these loans.   [Fact No. 11; Geist testimony; Trussell testimony.]

21.     The plaintiffs also pursued the development of the EGE GAZ Turkish LNG terminal.   [Minutes, Exhibit 27; Communications, Exhibits 114, 115, 116, 140 and 144; Progress reports, Exhibits 133-137;   Geist testimony; Trussell testimony; Johnston testimony; Carrara testimony.]

22.     The plaintiffs established contacts with LNG suppliers which were unwilling to proceed any further until the government of Turkey indicated that permission would be forthcoming.  [Carrara e-mail, Exhibit 45; Geist testimony; Carrara testimony; Johnston testimony.]

23.     Geist and Carrara advised Colakoglu that certain government officials had referred to the LNG terminal as "rogue" and "illegal" and that LNG could not be secured for the LNG terminal without approvals from the government of Turkey, that without such approvals the LNG could not be (a) imported into Turkey, (b) stored and operated at the Ege terminal, (c) transported over the government-owned pipeline system, and (d) under Turkish law, could be marketed to customers.   [Johnston fax, Exhibit 132; Carrara e-mail, Exhibit 46; Geist testimony; Carrara testimony; Johnston testimony.]

24.     During the entire period from April 2000 through May 2002, the plaintiffs were in continuous communication with Colakoglu's offices in Turkey, and spending considerable time working at his offices.   [Travel time lines, Exhibits 206-208; Geist testimony; Trussell testimony; Carrara testimony; Johnston testimony.]

25.     In late April 2002, Geist, Washington, D.C. attorney Charles R. "Rick" Johnston, Jr. and Colakoglu met to discuss the LNG terminal and the Selmo oilfields which the

company had nearly fully acquired and future plans.  [Notes of meeting, Exhibit 71; Geist testimony; Johnston testimony.]

26.     At the meeting, Geist and Colakoglu reaffirmed the way ahead, including funding for the company to allow completion of the LNG terminal, estimating that the terminal could generate $100 million per year in profits.  [Notes of meeting, Exhibit 71; Geist testimony; Carrara testimony; Johnston testimony.]

27.     These future plans respecting the LNG terminal were substantially in keeping with earlier discussion between the plaintiffs and Colakoglu involving ETC's relationship with EGE GAZ.   [Working points, Exhibit 2; Geist letter, Exhibit 49; Carrara e-mails, Exhibit 45 and 48; Geist testimony; Trussell testimony; Carrara testimony; Johnston testimony.]

28.     Also by early May 2002, after ETC acquired the full rights to the Selmo oilfields through the efforts of the plaintiffs and with the full support of Nuri Colakoglu, Colakoglu directed Geist to sell the field to Valentia Exploration and Production Limited, another company, which Niall Hoey would represent in the sales "negotiations".  [Fact No. 13; Colakoglu fax, Exhibit 77; Minutes, Exhibit 71; Johnston e-mail, Exhibit 78; Geist testimony; Johnston testimony.]

29.     Unbeknownst to the plaintiffs, the Colakoglus owned Valentia Exploration and Production Limited.  [Hoey deposition, p. 7, line 18 thru p. 8, line 12; Johnston e-mail, Exhibit 78; Geist testimony; Johnston testimony; Trussell testimony.]

30.     In late May 2002, ETC sold its oilfield interests to Valentia, with Hoey conferring with and obtaining his directions from Colakoglu during the "negotiations."  [Fact No. 14; Hoey deposition, p. 28, lines 11-16; Geist testimony; Hoey testimony.]

31.     By May 2002, significant progress had been made on addressing the barriers to the LNG terminal.   [Geist faxes, Exhibits 70 and 74; Carrara e-mails, Exhibits 65, 69; Terminal Agreement, Exhibit 123; Geist testimony; Johnston testimony; Carrara testimony.]

32.     Ultimately, an official announcement, dated June 27, 2002, was made by the Turkish government of a pending agreement between Ege Gaz and Botas (the relevant Turkish government agency) regarding use of the LNG terminal.    [Press Release, Exhibit 87; Geist testimony; Johnston testimony; Carrara testimony.]

33.     In July 2002, EGE GAZ retained attorney Daniel O'Donoghue to complete the agreement with Botas regarding use of the LNG terminal.  [O'Donoghue deposition, p.46, lines 23-25, and p. 47, lines 12-14.]

34.     In June 2002, Nuri Colagoklu directed Geist to convene a shareholders' meeting to elect Niall Hoey as a director of ETC.   [Hoey letter, Exhibit 85; Colakoglu letter, Exhibit 86; Geist testimony.]

35.     On July 1, 2002, Colakoglu executed a notice on behalf of Kingsland to ETC indicating dissatisfaction with ETC's efforts under the consulting agreement and suggesting ETC reimburse Kingsland the $10,000,000. [Colakoglu letter, Exhibit 90; Geist testimony.]

36.     The defendants do not claim that Kingsland's "dissatisfaction" is attributable to the acts of the Plaintiffs.  [Fact No. 20.]

37.     Niall Hoey (and attorney Daniel O'Donoghue) became directors of ETC on July 9, 2002.  Hoey was elected as chairman of the board.   [Minutes, Exhibit 92; Hoey deposition, p. 70, lines 16-20, p.74, lines 20-25, and p. 89, lines 9-21, and testimony; O'Donoghue deposition, p. 11, lines 19-20, and p.12, line 18 to p. 13, line 2, and testimony.]

38.     O'Donoghue had been hired earlier by Hoey to assist Valentia in the oilfield purchase negotiations. [Hoey deposition, p. 28, line 17 thru p. 29, line 5, and testimony; O'Donoghue deposition, p. 21, line 19 thru p. 22, line 23, and testimony.]

39.     Subsequent to the election of Hoey and O'Donoghue to the board of directors, ETC changed its modus operandi from informal to formal.  [Geist testimony; Johnston testimony; Hoey deposition, p. 63, line 22, and testimony; O'Donoghue testimony.]

40.     On July 4, 2002, Niall Hoey as managing director of Valentia Exploration and Production Limited executed a letter to ETC asserting that ETC had breached its seller's warranties and that Valentia would not pay the $3.2 million balance due ETC.  [Hoey letter, Exhibit 91;  Geist testimony; Hoey testimony.]

41.     After much discussion, Hoey and O'Donoghue "recused" themselves from responsibility for the warranty claims, requesting that Geist negotiate the claims with Hoey (who would represent Valentia).  [Minutes, Exhibit 95;  Hoey letter, Exhibit 105; O'Donoghue deposition, p. 120, lines 18-22; Geist testimony.]

42.     Valentia (through Hoey) subsequently retained O'Donoghue to develop its claims against ETC.  [O'Donoghue deposition, p. 50, line 6 thru p. 51, line 4 and p. 77, lines 18-20.]

43.     Valentia, in addition to retaining the oilfield interests and not paying ETC, ultimately obtained a $7+ million dollar default judgment against ETC for the alleged breach of warranty.   [Hoey deposition, p. 42, line 9 thru p. 43, line 12; O'Donoghue deposition, p. 29, lines 22 thru p. 30, line 24.]

44.     The defendants do not assert that the plaintiffs have a causal role regarding the Valentia claims. [Fact No. 19.]

45.     Geist, shortly after the April 2002 meeting, proffered employment extensions to, among others, himself, Trussell and Carrara and extended two business leases.  [Employment Extension Agreements of Geist, Trussell and Carrara, Exhibits 80, 81, 82;  Lease extension, Exhibit 89;  Lease renewal, Exhibit 212;  Geist testimony; Trussell testimony; Carrara testimony.]

46.     No payments were made to the plaintiffs after May 2002.  The Plaintiffs were constructively discharged from their employment without cause and are entitled to damages for breach of their employment agreements.  No further payments were made under the leases, leaving Geist to pay personally $258,439.64 for the Monaco property.   [Fact No. 16; Geist testimony; Trussell testimony; Carrara testimony.]

47.     The defendants, through director Niall Hoey, denied any intention to terminate the plaintiffs, referring to the defendants' dire financial straits attributable to the claimed warranty action and the Kingsland demand.  [Fact No. 16; Trussell and Carrara letters, Exhibits 97, 98; Hoey letter, Exhibit 100; Geist testimony; Trussell testimony; Carrara testimony.]

48.     The balance due Trussell for unpaid salary is $263,250.00 plus interest. [Employment Extension Agreement of Trussell, Exhibit 82; Trussell testimony.]

49.     The balance due Carrara for unpaid salary is $351,015.00 plus interest. [Employment Extension Agreement of Carrara, Exhibit 81; Carrara testimony.]

50.     The balance due Geist for unpaid salary is $1,365,000.00.  [Employment Extension Agreement of Geist, Exhibit 80; Geist testimony.]

51.     The amounts due Geist for lease payments in Monaco is $258,439.64; for rents in Albuquerque, New Mexico is $10,000.00, and for reimbursed moving expenses is $30,579.69. [Monaco lease and extension, Exhibits 11 and 12;   proof of payment, Exhibit 212;

Geist testimony.]

52.     The defendants are required to indemnify the plaintiffs.   [Facts No. 21, 22, 23;  ETC Bye-Laws, Exhibit 19;  Geist testimony; Trussell testimony; Carrara testimony.]

53.     The plaintiffs are incurring expenses and costs in defending the counterclaims brought in the instant case for which they are entitled to indemnification.   [Geist testimony; Trussell testimony; Carrara testimony.]

54.     The Defendants have failed to meet the burden of proof with respect to their counterclaims against the Plaintiffs.

55.     The testimony of the Defendants' witnesses Hoey and O'Donoghue is not credible.

## Plaintiffs' Requested Conclusions of Law

1.     The plaintiffs' employment-related agreements and the leases made for the benefit of the defendants by the plaintiffs were valid when made and are entitled to enforcement.

2.     Even if there were irregularities in the making of the employment-related agreements or the leases, the defendants have either waived the irregularities or ratified the agreements and are otherwise estopped from denying the validity of the employment agreements, the extensions and the leases.

3.     Plaintiff Trussell is entitled to an award of  $263,250.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements.

4.      Plaintiff Carrara  is entitled to an award of $351,015.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements.

5.      Plaintiff Geist is entitled to an award of $1,365,000.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements..

6.      Plaintiff Geist is entitled to an award of $258,439.64 for reimbursement of Monaco rents, plus $10,000.00 for Albuquerque, New Mexico office rents, plus $30,579.69 for reimbursement of moving expenses, plus interest.

7.      The Plaintiffs breached no duty owed to the corporate Defendants-counterclaimants and caused the defendants no damage.

8.      An actual case of controversy exists between the Plaintiffs and the Defendants as to the issue of Plaintiffs' non-liability to the defendants arising out of Plaintiffs' employment as officers (Geist, Trussell, Carrara) and position as director (Geist) with the corporate Defendants.  The Plaintiffs should be relieved from any, and otherwise owe no, further obligations to the defendants and are entitled to this Court's declaratory judgment of non-liability to that effect.

9.      The plaintiffs should be fully and completely indemnified pursuant to, and as provided by,  the ETC Bye-Laws in such amounts as may be shown by later hearing or motion.

10.     ETC, E-Tech North America, Kingsland Development and Valentia Production and Exploration Limited are all closely held entities controlled by the Colakoglus.

11.     Nuri Colakoglu who had actual or apparent authority for the Colakoglu interests was intimately involved in the operations of and decisions for ETC and E-Tech.

12.     Nuri Colakoglu authorized, directed, ratified, and personally benefitted from the actions of the Plaintiffs on behalf of ETC and E-Tech.

13.     Defendants ETC and E-Tech, as closely held corporations, have waived and/or are estopped from making any claims against the Plaintiffs because of the actions of the Defendants'

controlling shareholder Nuri Colakoglu.

       14.    Defendants ETC and E-Tech have no standing in equity to make claims against the Plaintiffs for alleged acts of corporate mismanagement, because their principal shareholder materially participated in, directed and ratified the actions of the corporation.

       15.    The counterclaims are brought in bad faith without justification.

                  Respectfully submitted,

                  ALDRIDGE, GRAMMER, JEFFREY
                     & HAMMAR, P.A.

                  By:_____
                     KEVIN D. HAMMAR
                     DAVID A. GRAMMER III
                  Attorneys for Plaintiffs
                  1212 Pennsylvania St. NE
                  Albuquerque, NM   87110
                  Tel. (505) 266-8787

The undersigned certifies that a true copy of the foregoing pleading was mailed to opposing counsel of record this 3rd day of February, 2004.

_____