UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

G. LEE TRUSSELL,
BRUNO E. CARRARA
and JERRY D. GEIST,

    Plaintiffs,

v.                                    Civil Action, File **No. 02-1337-RLP/LFG**

ENERGY & TECHNOLOGY
COMPANY, LTD.,
a Bermuda corporation, and
E-TECH NORTH AMERICA, LTD.,
a Delaware corporation,

    Defendants.

**PLAINTIFFS' SUPPLEMENTAL REQUESTED
FINDINGS OF FACT
AND REQUESTED CONCLUSIONS OF LAW**

    Come now the Plaintiffs, by their counsel, and submit herewith their Supplemental Requested Findings of Fact and Requested Conclusions of Law following the trial of this matter.

**Requested Findings of Fact**

    1.    In early 2000, Turkish citizen Nuri Colagoklu approached Jerry Geist, a New Mexico energy executive and consultant, to enlist his expertise and support in developing certain energy related projects, including assistance in developing a LNG (liquified natural gas) terminal being built in Turkey by EGE GAZ, a Colakoglu controlled company. [Testimony of Plaintiffs Geist and Carrara; Pl. Exhibits 2, 3, 5, 8, and 13; **Stipulated Factual Contentions**, Section IV.(A) of Pretrial Order (hereafter, "Facts", No. 4.].

1

2.  The LNG terminal was the first (and only) privately owned LNG terminal in Turkey. [Geist testimony; Johnston (deposition) testimony, p. 64, lines 15-22].

3.  Energy & Technology Company (hereafter, "ETC") (a Bermuda company) and E-Tech North America, Ltd. (hereafter, "E-Tech") (a Delaware company which was wholly owned by ETC) were formed as Colakoglu-controlled instrumentalities in support of developing Colakoglu-designated projects. [Facts No. 1, 2, 5; preliminary memoranda, Plaintiffs' Exhibits 5, 13; ETC Articles of Incorporation / Bye-Laws, Exhibit 19; Johnston memo, Exhibit 8; E-Tech Articles of Incorporation, Exhibit 28; E-Tech Structure Evaluation, Exhibit 26; Geist testimony; Trussell testimony].

4.  The ETC bylaws provide its employees with a right to indemnification for costs and legal expenses and bar certain claims brought by the company against its employees and officers.  [Facts No. 21-23; ETC Bye-Laws, Articles, 124 and 125; Exhibit 19].

5.  Both companies were closely held by, and subject to the actual control of, the Colakoglu interests, for which Nuri Colakoglu acted and spoke, and which were instrumentalities for the conduct of Colakoglu's personal business. [Fact No. 3; ETC Minutes, Exhibits 14 and 18, including proxy for Nuri Colakoglu; Geist testimony; Johnston (deposition) testimony, p.42, line 6 through p. 43, line 23].

6.  As intended by Colakoglu, the plaintiffs were hired as officers of ETC, *i.e.*, senior vice-presidents. [Preliminary memoranda, Exhibits 5, 6, 8, 13; Minutes, Exhibit 18; Budgets, Exhibits 6, 15; Agreements, Exhibits 21, 22, 23;  Geist testimony; Trussell testimony; Carrara testimony; Johnston (deposition) testimony, p. 22, lines 1-22; p. 32, lines 2-10].

7. The salaries and expenses (including leases of business offices) and other financial aspects related to the plaintiffs' employment by ETC and E-Tech were discussed and appropriately approved. [Preliminary memoranda, Exhibits 5 and 8; Minutes of ETC meeting, Exhibit 18; Budgets, Exhibits 6, 15; office location, Exhibit 17; Geist fax, Exhibit 13; Geist testimony; Johnston (deposition) testimony, p.30, lines 6-7.]

8. The leases were made and used for appropriate purposes and did not constitute undisclosed self dealing between the corporate parties and any or all of the plaintiffs. [Preliminary memoranda, Exhibits 5, 8 and 13; Lease of Albuquerque property, Exhibit 30; Lease of Monaco property and Lease communications, Exhibits 11 and 12; budgets, Exhibits 6, 15; office locations, Exhibit 17; Geist testimony; Johnston (deposition) testimony, p. 23, line 25 through p. 24, line 18.]

9. Geist disclosed to the shareholders his interest in the Albuquerque property and the Monaco property utilized by ETC and E-Tech for conduct of their business. The Albuquerque and Monaco locations were specifically disclosed in a proposed budget for ETC. The budget was reviewed and approved by all the shareholders at a meeting in early 2000. The rental and expense reimbursement arrangements made with respect to these locations were fair to the corporate Defendants at the time of their making and were reasonable.[Geist testimony; Budgets, Exhibits 6, 15, Bailey deposition testimony, p. 13, line 15 through p. 14, line 18.]

10. Geist, who was a minority shareholder, also was elected as one of two directors. Geist's director position was the only one with any authority--the other director being a "strawman" for Colakoglu. [Minutes of ETC meetings, Exhibits 14 and 18; Bye-Laws, Exhibit 19; Geist testimony; Johnston (deposition) testimony, p. 45, line 18, p. 37, line 23.]

11. Consistent with the preliminary and continuing arrangements approved by the shareholders--including the Colakoglus--the plaintiffs executed employment commitment agreements which were subsequently extended or modified. [Minutes of Meeting, Exhibit 13 (Paragraph 11); Minutes of ETC meetings, Exhibits 14, 18, 36-39, 71; Employment Agreements of Geist, Trussell and Carrara, Exhibits 21, 22, 23; Employment Extension Agreements of Geist, Trussell and Carrara, Exhibits 81, 82 and 83; Preliminary outline/budget, Exhibits 5, 6 and 8; Budget, Exhibits 6 and 15; Geist testimony; Trussell testimony.]

12. Geist, Carrara and Trussell served as Senior Vice Presidents of ETC under appointment by the Board of Directors of ETCThe company certified their positions in January 2001.. Their Board of Directors renewed the appointments of Trussell and Carrara by consent in lieu of formal meeting on January 19, 2001. The January 19, 2001 consent also vested Geist as chairman with authority to revise, limit or expand upon the Senior Vice Presidents' powers and duties. By an end of year (2001) resolution, the Board resolved to continue these appointments for one year or until election of the next Board. [Geist testimony; Exhibits 37, 40. 42; Johnston (deposition) testimony, p. 46, line 12 through p. 48, line 15.]

13. Colakoglu arranged for Kingsland Development, another Colakoglu controlled company, to fund ETC with $10,000,000 under a consulting agreement over a two-year period. [Fact No. 6; Kingsland contracts, Exhibit 20 (w/Johnston fax); Geist testimony; Johnston testimony; Trussell testimony.]

14. The details of managing the company were subject to Nuri Colakoglu's directions. [Preliminary memoranda, Exhibits 5 and 8; faxes to Colakoglu, Exhibits 24, 31, 45, 46, 47, 48, 49, 58, 61, 68, 69, 70, 72, 74, 75, 76; Geist testimony; Johnston (deposition) testimony, p.

43, lines 9-19, p. 74, lines 1-10; Trussell testimony; Carrara testimony.]

15. Up until mid-June 2002, Colakoglu and Geist managed ETC's affairs until Nuri Colakoglu directed Geist to convene a shareholders meeting for the purpose of electing new and additional directors. [Hoey fax to Geist, Exhibit 85; Geist testimony; Johnston (deposition) testimony, p. 43, lines 9-19.]

16. Up until that time, the companies had been run extremely informally, consistent with Nuri Colakoglu's instructions. [Geist testimony; Johnston (deposition) testimony, p. 43, lines 9-19, p. 74, lines 1-10; p. 91, lines 1-19; Trussell testimony; Carrara testimony.]

17. Every decision committing money or corporate resources, received the express or implied approval of Nuri Colakoglu. [Budgets, Exhibits 6 and 15; Geist faxes, Exhibits 31 and 33; Johnston notes, Exhibit 71; Geist testimony; Johnston testimony; Trussell testimony; Carrara testimony.]

18. During their tenure as officers and employees, the plaintiffs engaged in or made no unauthorized or undisclosed transactions. [Geist testimony; Trussell testimony; Carrara testimony.]

19. Baker Donelson submitted detailed billings to ETC. The billings were regularly reviewed by the Plaintiffs, especially Lee Trussell, who periodically questioned and sought clarification of line items. Major items of expense passed through on the Baker Donelsen billings, including consulting fees, were typically the subject of prior approval and contemporaneous discussion. The Baker Donelson billings were testified to by attorney Rick Johnston as being consistent with his firm's normal billing practice, and he testified that his billing rate was average among Washington, D.C. attorneys with his background and expertise. (Testimony of Geist,

testimony of Trussell; trial testimony (deposition) of Johnston, page 50, line 8 through page 58, line 25; Baker Donelson billing statements, Exhibits 110 and 113.)

20. Baker Donelson worked for ETC at the behest of Nuri Colakoglu and Jerry Geist. The services included regular and constant communication between Rick Johnston, Nuri Colakoglu, Jerry Geist, Bruno Carrara or Lee Trussell, as well as with representatives of the other involved Colakoglu companies, often up to seven days a week. The Baker Donelson firm provided a large variety of legal services on behalf of ETC, in response to requests for assistance from ETC's officers, and Nuri Colakoglu. (Testimony of Jerry Geist, testimony of Lee Trusssell, trial testimony (deposition) of Johnston cited at 19 above.)

21. The necessity of Baker Donelson's legal services rendered to ETC and the reasonableness of the charges for those services were unrebutted by the Defendants' testimony or proof.

22. The Plaintiffs did not engage in any acts of mismanagement during their tenure as officers (or, as to Plaintiff Jerry Geist, as director) of ETC. There was no failure by Plaintiffs to properly oversee, review and monitor the activities of the Baker Donelson firm on behalf of ETC. (Testimony of Lee Trussell; testimony of Jerry Geist, testimony of Bruno Carrara; trial testimony (deposition) of Johnston, page 50, line 8 through page 58, line 25; Baker Donelson billing statements, Exhibits 110 and 113.)

23. ETC settled the claims of Baker Donelson for the unpaid portion of its charges, approximately $550,000, by payment of that amount in late 2002 pursuant to a Lawrence Eagleburger / Nuri Colakoglu agreement. (Minutes of December 2002 board meeting, Exhibit 102; testimony of Daniel O'Donoghue; testimony of Geist; and testimony (deposition) of Johnston, p.

131, line 20 through p. 133, line 12; Eagleburger letter, Exhibit 101.)

24.     The plaintiffs provided correct, appropriate full accountings to Nuri Colakoglu and the other shareholders using a commonly available accounting program. The Defendants declineD to have KPMG provide another accounting. [Accountings, Exhibits 68, 184-196,, 197, 198, 202; Geist testimony; Trussell testimony; Carrara testimony.]

25.     Nuri Colakoglu, for the company/ies, was informed of and agreed to a course of action to acquire the rights in a Turkish oilfield (the Selmo field) and participated in oil field management.  [Geist faxes, Exhibits 31, 33 and 34; June 2000 Minutes, Exhibit 27; Colakoglu organization chart, Exhibit 139; Exhibit 164, 167; Geist testimony; Trussell testimony.]

26.     Nuri Colakoglu directed the plaintiffs to use Colakoglu's bank (TEB) to finance the acquisition of the oilfield rights. [Fact 11; Minutes, Exhibit 27; Geist testimony; Trussell testimony; Carrara testimony; Johnston (deposition) testimony, p. 14, lines 10-21; p. 85, line 10, p. 86, line 3.]

27.     Colakoglu's company, Kingsland, provided guaranties for these loans.  [Fact No. 11; Geist testimony; Trussell testimony.]

28.     The plaintiffs also pursued the development of the Colakoglu- controlled EGE GAZ Turkish LNG terminal with support from the Baker Donelson law firm. [Minutes, Exhibit 27; Baker Donelson reports, Exhibit 111, 112, 115, 117; Communications, Exhibits 114, 115, 116, 140, 141, and 144; Progress reports, Exhibits 133-137;  Geist testimony; Trussell testimony; Johnston (deposition) testimony, p. 70, line 22 through p. 73, line 18; Carrara testimony.]

29.     The plaintiffs established contacts with LNG suppliers which were unwilling to proceed any further until the government of Turkey indicated that permission would be

forthcoming. [Carrara e-mail, Exhibit 45; Progress Reports, Exhibits 135 and 136; Geist testimony; Carrara testimony.]

30. Geist, Johnston, and Carrara advised Colakoglu that certain government officials had referred to the LNG terminal as "rogue" and "illegal" and that LNG could not be secured for the LNG terminal without approvals from the government of Turkey, that without such approvals the LNG could not be (a) imported into Turkey, (b) stored and operated at the Ege terminal, (c) transported over the government-owned pipeline system, and (d) under Turkish law, marketed to customers. [Geist fax, Exhibit 24; Johnston fax, Exhibit 132; Carrara e-mails, Exhibits 46, 61, 62, 66, and 67; Geist testimony; Carrara testimony; Johnston (deposition) testimony, p. 67, line 4 through p. 68, line 19.]

31. During the entire period from April 2000 through May 2002, the plaintiffs were in continuous communication with Colakoglu's offices in Turkey, and spending considerable time working at his offices. [Travel time lines, Exhibits 206-208; Geist testimony; Trussell testimony; Carrara testimony; Johnston testimony (deposition), page 50, line 8 through page 58, line 25.]

32. In late April 2002, Geist, Washington, D.C. attorney Charles R. "Rick" Johnston, Jr. and Colakoglu met to discuss the LNG terminal and the Selmo oilfields which the company had nearly fully acquired and future plans. [Notes of meeting, Exhibit 71; Geist testimony; Johnston (deposition) testimony, Page 93, line 2 through page 97, line 22.]

33. At the meeting, Geist and Colakoglu reaffirmed the way ahead, including funding for ETC operations via the oilfield sales proceeds, estimating that the LNG business could generate $100 million per year in profits. [Notes of meeting, Exhibit 71; Geist testimony; Carrara

testimony; Johnston (deposition) testimony, page 93, line 2 through page 97, line 22.]

34.     These future plans respecting both LNG terminal and the sale of the oilfield entities were substantially in keeping with earlier discussion between the plaintiffs and Colakoglu involving ETC's relationship with EGE GAZ.  [Working points, Exhibit 2; Geist letter, Exhibit 49; Carrara e-mails, Exhibit 45 and 48; Johnston e-mail, Exhibit 29; Geist testimony; Trussell testimony; Carrara testimony; Johnston (deposition) testimony, p. 63, lines 18-25; p. 93, line 2 through page 98; line 9; p. 100, lines 12-24.]

35.     Also by early May 2002, after ETC acquired the full rights to the Selmo oilfields through the efforts of the plaintiffs and with the full support of Nuri Colakoglu, Colakoglu directed Geist to sell the field to Valentia Exploration and Production Limited, another company, which Niall Hoey would represent in the sales "negotiations". [Fact No. 13; Colakoglu fax, Exhibit 77; Minutes, Exhibit 71; Johnston e-mails, Exhibit 78 and 129; Geist testimony; Johnston (deposition) testimony, p. 94, line 12, through p. 95, line 1.]

36.     Unbeknownst to the plaintiffs, the Colakoglus owned Valentia Exploration and Production Limited having merely renamed Gustavia, an entity previously formed by Colakoglu. [Johnston e-mail, Exhibit 78; Geist testimony; Trussell testimony; O'Donoghue testimony; Hoey testimony.]

37.     In late May 2002, ETC sold its oilfield interests to Valentia, with Hoey conferring with and obtaining his directions from Colakoglu during the "negotiation.", with the funding advanced from other Colakoglu accounts. [Fact No. 14; Geist testimony; Hoey testimony; O'Donoghue testimony.]

38.     By May or early June 2002, significant progress had been made on addressing

the barriers to the LNG terminal. [Geist faxes, Exhibits 70 and 74; Carrara e-mails, Exhibit 69; Terminal Agreement, Exhibit 123; Johnston e-mail, Exhibit 129; Geist testimony; Johnston (deposition) testimony, p. 96, lines 5-23; p. 103, line 19 through p. 104, line 1; Carrara testimony.]

39. Ultimately, an official announcement, dated June 27, 2002, was made by the Turkish government of a pending agreement between Ege Gaz and Botas (the relevant Turkish government agency) regarding use of the LNG terminal. [Press Release, Exhibit 88; Geist testimony; Johnston (deposition) testimony, p. 103, line 19 through p.104, line 1; p. 95, line 23 through p. 97, line 2; Carrara testimony.]

40. In July 2002, EGE GAZ retained attorney Daniel O'Donoghue to complete the agreement with Botas regarding use of the LNG terminal. [O'Donoghue testimony.]

41. In June 2002, Nuri Colagoklu directed Geist to convene a shareholders' meeting to elect Niall Hoey as a director of ETC. [Hoey letter with enclosures, Exhibit 85; Geist testimony.]

42. On July 1, 2002, Colakoglu executed a notice on behalf of Kingsland to ETC indicating dissatisfaction with ETC's efforts under the consulting agreement and suggesting ETC reimburse Kingsland the $10,000,000. This was the first notice of any dissatisfaction from Kingsland and it came two months after the agreement terminated on its own terms and six months after the last payment under the agreement. [Colakoglu letter, Exhibit 90; Developer's Agreement, Exhibit 20; Geist testimony.]

43. The defendants expressly do not claim that Kingsland's "dissatisfaction" is attributable to the acts of the Plaintiffs. [Fact No. 20.]

44. Niall Hoey (and attorney Daniel O'Donoghue) became directors of ETC on

July 9, 2002. Hoey was elected as chairman of the board. [Minutes, Exhibit 92; Hoey testimony; Geist testimony; O'Donoghue testimony.]

45. O'Donoghue had been hired earlier by Hoey to assist Valentia in the oilfield purchase negotiations. [O'Donoghue testimony; Geist testimony.]

46. Subsequent to the election of Hoey and O'Donoghue to the board of directors, ETC changed its modus operandi from informal to formal, and there was a shift in attitude to one of anticipation of litigation. [Geist testimony; trial testimony (deposition) of Johnston, p. 130, line 21 through p. 131, line 9; Hoey testimony; O'Donoghue testimony.]

47. On July 4, 2002, Niall Hoey as managing director of Valentia Exploration and Production Limited executed a letter to ETC, drafted by O'Donoghue, asserting that ETC had breached its seller's warranties and that Valentia would not pay the $3.2 million balance due ETC. [Hoey letter, Exhibit 91; O'Donoghue testimony; Hoey testimony.]

48. After much discussion, with Hoey asserting he could represent both ETC and Valentia, Hoey and O'Donoghue ultimately "recused" themselves from responsibility for the warranty claims, requesting that Geist negotiate ultimately the claims with Hoey (who would represent Valentia). [Minutes, Exhibit 95; Hoey letters, Exhibits 104 and 105; O'Donoghue testimony; Hoey testimony; Geist testimony.]

49. Valentia (through Hoey) subsequently retained O'Donoghue to develop its claims against ETC. [O'Donoghue testimony.]

50. Valentia, in addition to retaining the oilfield interests and not paying ETC, ultimately obtained a $7+ million dollar default judgment against ETC for the alleged breach of warranty. [Geist testimony; O'Donoghue testimony.]

51.   The defendants expressly do not assert that the plaintiffs have a causal role regarding the Valentia claims. [Fact No. 19.]

52.   Geist, shortly after the April 2002 meeting, proffered employment extensions to, among others, himself, Trussell and Carrara and extended the Albuquerque lease. [Employment Extension Agreements of Geist, Trussell and Carrara, Exhibits 80, 81, 82; Lease extension, Exhibit 89; Geist testimony; Trussell testimony; Carrara testimony.]

53.   The employment extensions and lease renewals were consistent with Colakoglu's stated plans to continue ETC operations for at least another year, and also substantially consistent with the formal appointment reflected in ETC's minutes and with Geist's unrevoked power to act for the Board. [Geist testimony; Trussell testimony; Carrara testimony, Johnston (deposition) testimony, Page 102, lines 3 through 20; Minutes, Exhibits 36, 40, 42 and 71.]

54.   No payments were made to the plaintiffs after May 2002. The Plaintiffs were constructively discharged from their employment without cause and are entitled to damages for breach of their employment agreements. No further payments were made under the leases, leaving Geist to pay personally $258,439.64 for the Monaco property and to address the nonpayment of the Albuquerque lease. [Fact No. 16; Geist testimony; Trussell testimony; Carrara testimony.]

55.   The defendants, through director Niall Hoey, denied any intention to terminate the plaintiffs, referring to the defendants' dire financial straits attributable to the claimed warranty action and the Kingsland demand. [Fact No. 16; Trussell and Carrara letters, Exhibits 97, 98; Hoey letter, Exhibit 100; Geist testimony; Trussell testimony; Carrara testimony.]

56.   The balance due Trussell for unpaid salary is $263,250.00 plus prejudgment interest. [Employment Extension Agreement of Trussell, Exhibit 82; Trussell testimony.]

57. The balance due Carrara for unpaid salary is $351,015.00 plus prejudgment interest. [Employment Extension Agreement of Carrara, Exhibit 81; Carrara testimony.]

58. The balance due Geist for unpaid salary is $1,365,000.00 plus prejudgment interest. [Employment Extension Agreement of Geist, Exhibit 80; Geist testimony.]

59. The amounts due Geist for lease payments in Monaco is $258,439.64; for rents in Albuquerque, New Mexico is $10,000.00, and for reimbursed moving expenses is $30,579.69. [Monaco lease and extension, Exhibits 11 and 12; proof of payment, Exhibit 212; Geist testimony.]

60. The defendants are required to indemnify the plaintiffs. [Facts No. 21, 22, 23; ETC Bye-Laws, Exhibit 19; Geist testimony; Trussell testimony; Carrara testimony.]

61. The plaintiffs are incurring expenses and costs in defending the counterclaims brought in the instant case for which they are entitled to indemnification. [Geist testimony; Trussell testimony; Carrara testimony.]

62. The Defendants have failed to meet the burden of proof with respect to their counterclaims against the Plaintiffs.

63. The testimony of the Defendants' witnesses Hoey and O'Donoghue was not credible. They placed themselves in a conflict of interest by their prosecution of Valentia's warranty claims against ETC, and are motivated by their own pecuniary interests (i.e. each having an interest in any recovery against the Plaintiffs; O'Donoghue seeking the Colakoglu companies as clients; Hoey as donee of a 20% share in Valentia, equivalent to the $3.2 million owed ETC) without due regard to the interests of ETC. (Testimony of Niall Hoey, testimony of Daniel O'Donoghue, testimony of Jerry Geist, testimony (deposition) of Johnston, p. 130, line 21 through p. 131, line 16;

p. 133, line 22 through p. 134, line 14.)

### Plaintiffs' Requested Conclusions of Law

1. The plaintiffs' employment-related agreements and the leases made for the benefit of the defendants by the plaintiffs were valid when made and are entitled to enforcement.

2. Even if there were irregularities in the making of the employment-related agreements or the leases, the defendants have either waived the irregularities or ratified the agreements and are otherwise estopped from denying the validity of the employment agreements, the extensions and the leases.

3. Plaintiff Trussell is entitled to an award of $263,250.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements.

4. Plaintiff Carrara is entitled to an award of $351,015.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements.

5. Plaintiff Geist is entitled to an award of $1,365,000.00, plus interest from June 1, 2002 caused by the defendants' breach of his employment-related agreements.

6. Plaintiff Geist is entitled to an award of $258,439.64 for reimbursement of Monaco rents, plus $10,000.00 for Albuquerque, New Mexico office rents, plus $30,579.69 for reimbursement of moving expenses, plus interest from August 1, 2003.

7. The Plaintiffs breached no duty owed to the corporate Defendants-counterclaimants and caused the defendants no damage.

8. An actual case of controversy exists between the Plaintiffs and the Defendants as to the issue of Plaintiffs' non-liability to the defendants arising out of Plaintiffs' employment as officers (Geist, Trussell, Carrara) and position as director (Geist) with the corporate Defendants. The

Plaintiffs should be relieved from any, and otherwise owe no, further obligations to the defendants and are entitled to this Court's declaratory judgment of non-liability to that effect.

9. The plaintiffs should be fully and completely indemnified pursuant to, and as provided by, the ETC Bye-Laws in such amounts as may be shown by later application to the Court.

10. ETC, E-Tech North America, Kingsland Limited and Valentia Production and Exploration Limited are all closely held entities controlled by the Colakoglus.

11. Nuri Colakoglu who had actual or apparent authority for the Colakoglu interests was intimately involved in, and controlled, the operations of and decisions for ETC and E-Tech.

12. Nuri Colakoglu authorized, directed, ratified, and personally benefitted from the actions of the Plaintiffs on behalf of ETC and E-Tech.

13. Defendants ETC and E-Tech, as closely held corporations and as the majority shareholder's alter-egos, have waived and/or are estopped from making any claims against the Plaintiffs because of the actions of the Defendants' controlling shareholder Nuri Colakoglu.

14. Defendants ETC and E-Tech have no standing in equity to make claims against the Plaintiffs for alleged acts of corporate mismanagement, because their principal shareholder materially participated in, directed and ratified the actions of the corporation.

15. The Defendants have failed to sustain the burden of proof with respect to their affirmative defenses or their counterclaims.

16. The counterclaims are brought in bad faith without justification.

Respectfully submitted,

ALDRIDGE, GRAMMER, JEFFREY
 & HAMMAR, P.A.


By: <u>ELECTRONICALLY FILED</u>
      KEVIN D. HAMMAR
      DAVID A. GRAMMER III
Attorneys for Plaintiffs
1212 Pennsylvania St. NE
Albuquerque, NM  87110
Tel. (505) 266-8787


The undersigned certifies that a true copy
of the foregoing pleading was served via facsimile
transmission to opposing counsel of record at the
facsimile number shown below, and was via United
States mails with sufficient first-class postage affixed,
addressed to opposing counsel of record at the address
shown below, this 5th day of March, 2004:

O'Gorman & Sandroni P.C.
Attn: Andrew D. Sandroni
Attorney for Defendants
8050 Watson Rd., Suite 240
St. Louis, MO 63119
314-843-2000
314-843-7332 (fax)

William J. Darling & Associates, P.A.
Attn: William J. Darling
Attorney for Defendants
P. O. Box 3337
Albuquerque, New Mexico 87190-3337
505-888-4567
505-883-2873 (fax)

<u>ELECTRONICALLY FILED</u>
KEVIN D. HAMMAR
DAVID A. GRAMMER III

_____